Good morning, Your Honors. Stephen Montoya here on behalf of the appellant, Diane Maggi. I would like to reserve, with the Court's permission, four minutes for rebuttal. Counting down. Just keep an eye. I think this is a simple case. You have a judge who, in one paragraph, concluded that the employer-defendant had prevailed on the issue of summary judgment on its affirmative defense under Farragher and Ellerth. And, indeed, the facts not only showed that summary judgment was precluded by a material factual dispute. In fact, the facts were overwhelmingly in favor of the plaintiff. As the Court is aware, under the Supreme Court's decision in Farragher v. City of Boca Raton and Ellerth v. Burlington Industries, an employer can defend itself from a case of discriminatory harassment if there's no tangible employment action, if it establishes both of a two-pronged affirmative defense. In this case, first of all, Farragher and Ellerth wasn't even applicable because there was a tangible employment action, or at least a jury could have reasonably so found. And that tangible employment action would have been constructive discharge. My client had been subjected to almost a year's worth of what I would have to characterize as low-level but pervasive verbal and physical sexual harassment consisting of low-level sexual comments. Will you go out with me? Are you going to dress slutty? You're a hoochie massaging the neck, massaging the arm, coupled with ultimately threats. I'd like to put a bunch of barges soap in a pillowcase and beat the crap out of you. She was afraid to complain because two of her colleagues had already complained of verbal and physical sexual harassment from the same perpetrator, the medical director of Sunrise, Khalid Shaleef, and the HR director who reports to Dr. Shaleef's older brother, found that there was no basis for the complaints because they were allegedly uncooperated. And when did that occur? That occurred just weeks before Diane Madgey's complaint. Not at all long before your client's complaint. Correct. So during most of the time that she's receiving the unwanted attention, she's not saying anything. That's correct, Your Honor. And it's not because she's fearful of what happened to her colleagues because they hadn't said anything yet either and the HR director hadn't yet acted in the way you described. But by the time she did complain, first she was afraid to complain. It was the owner's younger brother. I think that's understandable under the circumstances. In fact, one federal court cited in our opening brief and also cited in our reply has cited similar circumstances in concluding that the victim's failure to complain promptly wasn't a big deal. But moreover, Judge Clifton, that's an interesting point because actually in this particular case, that's a red herring. Well, most of what you've been talking about so far seems to be a red herring. You're not really paying much attention to what the district court concluded. Well, I think I am because I think that the district court made its conclusion regarding the red herring. She didn't complain quickly enough and then she didn't give them enough time to remedy the problem is what the district court concluded in one paragraph. However, that is irrelevant, Judge Clifton, because once she did complain, she emphatically did complain when she still worked there. What did the employer do? Exactly what she was afraid of. Nothing except perhaps retaliate against her because instead of doing anything to the perpetrator, who two other women were complaining about, the employer did something to her, namely it transferred her to a less desirable position. A lot of people, a lot of nurses, a lot of lawyers want to work in the trial court. They don't want to work in the office. She wanted to work in the field as a hospice nurse. They offered her a position in the home office where she would actually have to work with Dr. Sharif more than she did in the first place. And that's all they offered her, is a chance to continue to work even closer to the doctor than she had in the first place. So I think that's a red herring, Judge Clifton. She didn't complain on time. Then she started to quit before we even had a chance to remedy. I think that would be a good argument if they, in fact, would have done something once she did complain. But even though three separate women were complaining about the same guy who was their supervisor during the same relative time period, what did the HR person do who reports to the harasser's older brother? These are uncooperated complaints. These are unsubstantiated complaints. They did absolutely nothing. So if it's a dilatory complaint --" Sotomayor, let me ask you this. Yes. What are the facts in dispute that need to be resolved by a trier of fact? What Rebecca Marcella, the HR director, told my client in their two meetings, Rebecca Marcella says, hey, I outlined some options for her. She could transfer to the home office. Even though we admit that Dr. Sharif works at the home office regularly, she would we would find ways to avoid they could find ways to avoid each other physically because they're in two different divisions. So there's a dispute over what was said in that meeting? Yeah. Absolutely. Ms. Marcella claims that she gave Ms. Maggi several options. Diane Maggi, in her affidavit, says she gave her one option. To move to the office. Pardon me? To move to the main office. Yeah. And that's on the record, Volume 2, page 84, paragraph 48. Quote, in response to my complaint, the only option that Ms. Marcella ultimately gave me was a so-called lateral transfer to an MPM position working as an assistant to a team manager at the Sunrise's home office. Paragraph 50, I told Ms. Marcella I was not interested in such a transfer. Paragraph 51 ---- So let's assume that the jury agrees, finds on that issue in your favor. What does that get you? Where does that lead you on the defense? Well, then the affirmative act, assuming there's no tangible employment action. Because if there's a tangible employment action, then this is a moot issue. If there's not a tangible employment action, the jury could conclude that they failed to establish their burden of proof. They failed to meet their burden of proof on their affirmative defense, and we would win. That's what would happen. So the other tangible action here, from your perspective, is the constructive discharge. Yes. Because they forced her. The situation was such that they forced her. There's evidence that she had already made the decision to leave when she met with Marcella. Well, she was looking for a job. And guess what? That's a commendable thing to look for a job. A lot of people in the real world cannot afford to be unemployed for a day or for a week. She saw that she was complaining against the medical director. That's a super important position. She saw that the medical director's brother was the owner. That's a very tough position. Two of her colleagues had complained unavailingly and were subsequently terminated for misconduct. One thing you don't want to be in this job market is unemployed after having been terminated for misconduct.  She had a family to support. She had to support herself. So she started looking for another job. But the record is undisputed that when she filed her EEOC complaint, even though she was looking for another job, and when she met with the HR director of Sunrise, she was looking for another job, but she hadn't been offered one, nor had she accepted it. The record is undisputed that she was not offered another job until December 22nd, and she didn't accept the other job until June — no, excuse me, January 4th of the following year, after she had been constructively discharged from Sunrise. So the evidence is clear. Even after her unproductive meeting with the HR director, she still was trying to save her job or trying to salvage something out of her job from Sunrise. She didn't immediately quit. She waited until the last day. Sunrise wasn't going to do anything about her complaint. She was going to have to continue to work in the same building with Dr. Sharif in a less desirable position. So she took the other job. The EEOC significantly. Let me ask you another question. Your time is running out. Yes. So what — you also challenged the district court's ruling on the retaliation claim. Yes, Your Honor. I think — Which focuses on the defamation lawsuit that was filed by the doctor, and the district court said, well, there's just no connection between that lawsuit and creative. The district court didn't say that. Sunrise said that. Well, that's essentially what the district court said. Judge Wyeth, the district court didn't say anything at all about our retaliation claim. Zero, not one sentence. I thought there was a minor discussion of that. There was a little discussion of the retaliation claim. Well, Your Honor, no analysis, no factual analysis. That is a question of fact. In the real world, and certainly in this case, when a licensed practical nurse is sued for defamation in state court by her former employer — But the basis for the lawsuit was that she and the other two, as I recall, the other two nurses, made comments about the doctor to some reporter. Yeah. They said that she sexually harassed her at Sunrise. So then the doctor turns around and files a lawsuit against her for defamation. And so did creative. Creative only filed the lawsuit against one of the nurses, Susan Brand. Right. Now, the doctor has his own right to file a defamation lawsuit if he wants. Yeah. What's the evidence that there was some sort of — I don't want to — some sort of arrangement — Collusion? Or participation? You know, that they would do it — they would work together in filing these lawsuits. Okay. Is there any evidence of that? I think there is, Your Honor. Most of it, I admit, is — I couldn't find any when I looked through the records, so — Well, I'll tell you what it is, Your Honor. Okay. First of all, all of these lawsuits were related. They were all consolidated by the trial court in Maricopa County. Sunrise was the plaintiff in some of them. Dr. Sharif was the plaintiff in two — Sunrise was the plaintiff in one of them. Dr. Sharif was the plaintiff in two others. They were all consolidated. They were all brought by the same law firm. And in fact, that same law firm represented Sunrise in this case. They all were litigated together. The parties participated in the lawsuits, went to all of the depositions. They were negotiated together. When we tried to negotiate the resolution of the defamation case, everyone was there. So looking at the totality of circumstances, Your Honor, there was circumstantial evidence that Sunrise was behind the defamation action. And we believe — But you're telling us about what a trial court does to manage its calendar by putting cases together, and that's supposed to demonstrate that this defendant is somehow behind the other lawsuit. There seems to be a disconnect there. That's a good point, Your Honor. But remember the underlying standard for consolidation, a rise from the same nexus of facts and law. The same television broadcast. So Your Honor, they were — they were related. They involved the same parties. And that says nothing about whether this defendant was responsible for the doctor's lawsuit. Well, Your Honor, I don't think — construing the facts and the inferences in favor of the plaintiff, I think that is circumstantial evidence that there was cooperation. And I think a reasonable jury could find that, in fact, Sunrise was behind the defamation lawsuit. I think in a great jury argument, but when you're dealing with us, you're dealing with summary judgment. I think you've got to come more to grips with the facts that we've got in front of us. Well, Your Honor — Well, you might like to engage. Is that the strongest factual case that can be presented? No. But is it enough to preclude summary judgment? Construing the facts and the inferences, Your Honor? I think a jury could reach this conclusion that you've suggested this morning. But I think a jury would have to make that. Making that conclusion as a matter of law after construing the facts and the inferences — You've used up almost all of your time. The bottom line is this, Your Honor, Farragher and Eller, an affirmative defense, that was precluded because there were sufficient facts of constructive discharge, and there was no evidence that Sunrise ever enforced its anti-discrimination policy, and in fact, the evidence was to the contrary in reference to not only my client, but also two other women. You're over your time. Thank you. Thank you. Thank you, Your Honor. May it please the Court. My name is Nathaniel Hill, representing Sunrise in this case. I guess I'll just respond to some of the points made, and I had some other points I'd like to make as well. To clarify, Ms. Madje never asserted a retaliation claim based on the alleged — the transfer or proposed reassignment. That was not alleged as a basis of retaliation. No, it's the lawsuit that's a retaliation. It's only the lawsuit. Right. Just to clarify. Counsel, I just took that as dramatic effect. Okay. We respectfully request that this panel affirm the underlying summary judgment order because the district court there assumed, without making any findings, but assumed that there was, in fact, a hostile environment. Assumed that Dr. Sharif was, in fact, Ms. Madje's supervisor. And even under that stricter L. Earth Farragher standard, Sunrise met the affirmative defense there. Sunrise gave Ms. Madje a copy of its policy, its procedures, its handbook that had anti-discrimination policies in it, grievance mechanisms. She signed an acknowledgment of this when she was first employed in January 2009. Did not take advantage of that throughout her tenure. And then when she did — when Sunrise finally did become aware of her complaints, it immediately, that same day, contacted her, started an investigation, interviewed — boy, I should have counted how many other employees that were there. And when he says that they didn't corroborate it, that wasn't a knee-jerk response. This was after a significant and lengthy and very involved investigation of all of its other employees. And furthermore, the fact that Ms. Madje decided to resign even prior to the proposed transfer assignment was finalized, she resigned on her own. This was part of the responsive measures that Sunrise's human resources person was trying to do. The proposed offer to work in the office was one of several proposals. It was — You're asking us to accept your affidavit as truth. We have a counter-affidavit from plaintiff who says there's one proposal. How can we decide — Very good. That's a good point. Even taking that — she doesn't say that it was finalized. This was proposed, even if it was only one, this was proposed as an option for her to be in the office. The purpose of her to be in the office was that this would eliminate one-on-one interactions between Dr. Sharif and Ms. Madje. So as to avoid — if her concern is that she's out, what they do is they may visit a home, she as a LPN would give care, him as a doctor would view a patient — So why should she accept that as the alternative? If what she liked doing was being out in the field, and what the company appeared to be saying to her, at least according to her version, is that, well, we're not going to do anything about the harassment from the doctor, if you're out in the field, you can try to work in another part of the company doing a job you don't like, because then you won't see him as often. How appetizing an alternative is that? She didn't propose that she stay out in the field. The fact of the matter is, is that Dr. Sharif is the only physician at the company. So from her perspective, does that mean that she's required to accept the harassment because he's the only doctor and the company's not going to tell him to straighten up his act? No, that's not what we're suggesting. What we're suggesting is if there is a change in the roles or a reassignment, the financial and business impact it would be to reassign Dr. Sharif somewhere else would be devastating to the company. Well, fine, but why is that her problem? Why can't she continue with the job she likes, only not have this doctor coming on to her on a regular basis? Why isn't the company obligated to try to do something about the performance and behavior of its employees, as opposed to telling the plaintiff you've got to go work in another part of the company? Well, Dr. Sharif, I mean, things were handled with Dr. Sharif on his end, but there is case law in the Ninth Circuit that says that a reassignment or transfer can meet the business needs of a company. Is that in the context of where you've just told me the reality, which is that he's the medical director, he's the only doctor, and so it's going to be hard to operate as a nurse in a hospice organization if you're fearful of coming into contact with the only person who's an MD. Well, the proposal to have her be at the office was because she would not be alone with him. The hope being that if there are other people around, it would eliminate any of these supposed sexually harassing, inappropriate touching, other things like that. So that's the point of having her be close so that they can monitor any interactions that he may be potentially having with her. And if it continues to discipline him accordingly. But at the point that it was at, it was not fully developed. The investigation was only a day old at that point. They were making a suggestion so that she could keep her same salary, her same benefits, her same commute, to not lose any of her financial benefits, which was the concern expressed by counsel that she didn't want to lose her job, but to, in the meantime, get to the bottom of it. It was only a day old. What else might have transpired after that was never known because the next day she left and admitted that she was never going to return. Did the HR director come up with any other proposals in the next couple of weeks while she was gone? They knew that she was not going to return shortly thereafter. So I don't know of any. How did they know that? Through counsel. The Sunrise was notified that Ms. Maggie was not going to be returning. When was that? And what evidence do we have in the record? I believe that she was notified on December 31st or January 1st that she was resigning. February or January 4, I think it is, your client sends a letter of termination. She hasn't reported back to work. That was earlier than that. So January 4 is the day that she actually starts a new job because, as we said, she had already found a job as of December 11th and she intended to go to that other job as of December 11th. We received the EEOC charge around December 15. The 16th, the investigation starts. The 17th is when they discussed the alternative position. She does not show up for that and through an attorney says that she wants to go on a medical leave. It was within a few days or a week of that. So mid to late December, Ms. Maggie's attorney was sent a letter through Sunrise's attorney saying that if she did not return to work, her job would be cancelled. December 30th. You're right. January 4 was the date that they said that we'd consider her terminated if she doesn't return. But the letter is sent December 30th. She was being invited to return to work. She obviously had counsel at the time. If her counsel wanted to negotiate the terms of whatever position she would be coming back to, she was at liberty to do so, but there was no such correspondence. It was just said that she was going to be on a medical leave. She wasn't eligible for FMLA leave because she hadn't worked there a year. But again, Sunrise was open to resolving these things, but she was no longer responsive and only communicated through her attorney thereafter. So there was no opportunity to get to the final resolution for that. You want to address the – well, Mr. Clifton has more questions on this. Did you want to address the retaliation claim for just a moment? Yes, I'm happy to do that. So as I mentioned, the retaliation was only limited to Dr. Sharif filing a defamation lawsuit. This is a conspiracy theory that somehow Sunrise was behind this because of the consolidated nature of the lawsuit. In the Superior Court. In the Superior Court. There was a nexus of facts because Ms. Maggie had collaborated with Ms. Brand. There was a third female, Paulette Windsor, who she later came forward and said that they had these meetings that they would have together and decided and discussed how they would try to take down the company. Well, that was part of the nexus was where they had the same agenda to file these claims. So in that regard, those were the – there was a relationship to Creative, and Creative also had – or, excuse me, Sunrise, there's another trade name. Sunrise had a lawsuit against Ms. Brand because of misappropriating company secrets and being in breach of her contract. So there was already a pending lawsuit where some of those issues were relevant. And then the later lawsuit from Dr. Sharif was related because of that nexus of facts and similar parties, and it was from the same law firm. So it was more convenient to consolidate those. And that was – a motion was filed, and the Superior Court agreed that the matter should be consolidated. Retaliation for going on the news just isn't there. There's – But then he filed a defamation lawsuit. Well, then he filed a defamation lawsuit for her statements that she made to the news media. Right. Okay? This was not a defamation lawsuit for the statements that she made to the EEOC. This was not for participating in this process. This was solely for her going on to the news. And we would argue that that is not protected activity or protected opposition to do that in this case. It may be in other cases, but in this case, that was not a protected – Well, he has the right to file his own lawsuit. I mean, he could pursue a defamation claim if he wants, but I guess the inference here or the suggestion here is that he was coordinating his lawsuit with Sunrise. There was a common nexus of these facts. It was – Or that Sunrise was encouraging him or somehow helping to facilitate the filing of the defamation case. As shown in the – We don't have much – there's not much evidence in the record. Right here that's filed here with the court is Dr. Sharif's deposition. And in the record that's here, as he goes into detail – I don't have the page numbers in front of me about how emotionally devastating it was to experience this. He filed this defamation lawsuit of his – We did take a look, and the only thing that caught my eye was his deposition, page 371, where he says, I go from I want to sue, I want to sue, to I need this to be over, and he ran the show more than once, I guess the video clip. And I said, that's it. And it took us some time to get everything together, and we finally got it together. The deposition isn't really – in the excerpts of record, the deposition isn't complete, and you can't – I can't tell who he is. Well, from what I would assume, it's probably him and his legal counsel deciding that that's what he wants to do, to understand what the ramifications of filing a defamation lawsuit are and what the consequences would be. I have no reason to believe that this was influenced or encouraged by his older brother, Tariq Sharif, who is the owner of Creative. They're different people, and they're different entities. The fact that there's a commonality here doesn't mean that this was a retaliatory action from Sunrise. Dr. Sharif is not an owner of Sunrise. He's not an employee of Sunrise. He's an independent individual altogether. He filed the defamation lawsuit to clear his own name. This has devastated his practice in Maricopa County, Arizona, because of this. Him personally. Irrelevant of Sunrise or its dealings, him as a physician was significantly harmed by these comments. Did he have a separate practice? Sorry? Did he have a separate practice other than being medical director for Sunrise? At the time, no. So how devastating could it be except for what he was doing with Sunrise? Well, I'll take that back. I think he did have other things that he was doing, and even now, it's hard for him. Him as a physician is the reason why there were significant losses to Sunrise and Sunrise's ability to meet his salary demands. So it affected him financially because of the personal attack on him that Sunrise lost business. But this was not orchestrated or a collaborative effort by the other side. Could I just clarify one thing? Dr. Shrieff had no management responsibilities over mismanaging, other than the medical care. Correct. Because he's a doctor and she's the nurse. Correct. He didn't fire her. He did not have the authority to set her rate of pay, terms and conditions of employment benefits. He didn't have the ability to fire her. He made sure that the patient, him or herself, received adequate medical care, and whoever, either the nurse or LPN, would attend to that. If they had questions, they would communicate with him, but he had nothing, no control over her employment. Okay. Thank you. In my last few seconds, there was no tangible employment action. Ms. Maggie resigned of her own. We respectfully request that the finding of summary judgment below be affirmed. Okay. Thank you very much, counsel. Matter submitted.
judges: Paez, Clifton, Duffy